**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**BRADRICK DALE SPENCE,**

　　　**Plaintiff,**

**v.**　　　　　　　　　　　　　　　　**Case No.: 3:17-cv-02388**

**NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,**

　　　**Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

　　This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's brief requesting judgment on the pleadings and the Commissioner's brief in support of her decision, requesting judgment in her favor. (ECF Nos. 10, 13).

　　The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's

request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be **GRANTED;** the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On September 13, 2011, Plaintiff Bradrick Dale Spence ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of January 7, 2008 due to issues with his "back, knees, ankles, anxiety, depression, reading comprehension, [and] mood swings." (Tr. at 292-305, 344). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 27). Claimant then filed a request for an administrative hearing, which was held on February 7, 2013 before the Honorable LaRonna Harris, Administrative Law Judge ("ALJ Harris"). (*Id.*). On June 26, 2013, ALJ Harris issued a partially favorable written decision finding Claimant disabled as of March 17, 2012, but not disabled prior to that date. (*Id.*). Claimant appealed ALJ Harris's decision to the Appeals Council, which vacated the decision in its entirety and remanded the case for further consideration. (*Id.*). On remand, a second administrative hearing was held on October 16, 2015 before the Honorable Maria Hodges, Administrative Law Judge (the "ALJ"). (Tr. at 48-82). By written decision dated February 3, 2016, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 24-47). The ALJ's decision became the final decision of the Commissioner on February 9, 2017 when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer

opposing Claimant's complaint, and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant filed a Brief in Support of Judgment on the Pleadings and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 10, 13). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 31 years old on his alleged onset date and 39 years old on the date of the ALJ's decision. (Tr. at 39). He has a general education diploma and vocational training in "auto body" and mechanics, and he communicates in English. (Tr. at 54-55, 343). Claimant previously worked as an assistant manager, stock clerk, cashier, car detailer, chemical tank cleaner, housekeeper, infantry soldier, automobile mechanic, and a shipper/loader. (Tr. at 76-77, 345).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a

determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through June 30, 2012. (Tr. at 30, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since January 7, 2008, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "obesity, degenerative disc disease, degenerative joint disease, plantar fasciitis, depression, anxiety disorder, and polysubstance disorder." (*Id.*, Finding No. 3). The ALJ considered Claimant's alleged reading disorder, but did not consider it to be a medically determinable impairment and Claimant's status-post anal fissure surgery, but found the impairment to be non-severe. (Tr. at 30-31, Finding No. 3).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 31-32, Finding No. 4). Accordingly, she determined that Claimant possessed:

> [T]he residual functional capacity to lift and carry 20 pounds frequently, 10 pounds continuously; sit for one hour at a time, for a total of three hours during an eight hour workday; stand for one hour at a time, for a total of three hours during an eight hour workday; walk for one hour at a time, for two hours during an eight hour workday; occasionally use right foot control; frequently use left foot control; occasionally climb ramps and stairs; frequently balance; never climb ladders, ropes, or scaffolds; never stoop, kneel, crouch, or crawl; never be exposed to moving mechanical parts, extreme cold, and vibration; occasionally be exposed to unprotected heights and operate a motor vehicle; can be exposed to loud noise; can understand, remember, and carry out simple, three step instructions; cannot interact with the general public; and can have occasional contact with co-workers and supervisors in a non-confrontational setting.

(Tr. at 32-38, Finding No. 5). At the fourth step, the ALJ determined that Claimant was

unable to perform any past relevant work. (Tr. at 38, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 39-40, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1976 and was defined as a younger individual age 18-49 on the alleged disability onset date; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 39, Finding Nos. 7-9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including light level jobs such as an office helper, order clerk, and non-governmental mail clerk. (Tr. at 39). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. 40, Finding No. 11).

**IV.    Claimant's Challenges to the Commissioner's Decision**

Claimant presents several challenges to the Commissioner's decision. First, Claimant argues that the "ALJ based her RFC on the report of consultative examiner Drew Apgar, D.O, but misstate[d] in the decision some of Dr. Apgar's observations in his report as well as other evidence in the record which results in creating conflicts rather than resolving them." (ECF No. 10 at 8-9). According to Claimant, the ALJ stated that Claimant had no difficulty getting on and off of the examination table and moving around the room during Dr. Apgar's examination, although the report clearly indicated that Claimant performed such actions with difficulty. (*Id.* at 9). Claimant also contends

that the ALJ failed to acknowledge that Claimant was not fully weight-bearing, had an unsteady gait, and could not heel, toe, or heel-to-toe walk, squat, or rise during the examination. (*Id.* at 10). Further, Claimant asserts that the ALJ's representation that Dr. Apgar found Claimant to be "obese without mechanical limitations" did not appear anywhere in Dr. Apgar's report. (*Id.*). Second, Claimant alleges that the ALJ did not comply with governing regulations by not evaluating the effects of Claimant's obesity on his ability to perform routine movements and do the necessary physical activity to succeed in work environments. (*Id.*). Finally, Claimant criticizes the ALJ's analysis of his pain and credibility. (*Id.* at 10-11).

In response, the Commissioner argues that Claimant fails to demonstrate any prejudice from the alleged factual inaccuracies in the ALJ's decision. (ECF No. 13 at 11). The Commissioner points out that the ALJ adopted all of Dr. Apgar's assessed limitations, and Claimant does not argue that any further limitations were warranted. (*Id.*). Therefore, the Commissioner contends that Claimant does not show that any error in the ALJ's summarization of the examination findings would have changed the ALJ's decision. (*Id.* at 12). As to the ALJ's statement that Dr. Apgar found that Claimant was obese without any mechanical limitations, the Commissioner asserts that such statement is indeed included in Dr. Apgar's report, contrary to Claimant's suggestion. (*Id.* at 12). Further, the Commissioner notes the ALJ's discussion of Claimant's obesity and observes that neither Claimant, nor any medical provider, articulated any further limitations due to Claimant's obesity. (*Id.* at 13-14). Finally, the Commissioner maintains that the ALJ correctly analyzed Claimant's alleged chronic pain syndrome, which is a different condition than "chronic pain," and evaluated Claimant's subjective complaints of pain. (*Id.* at 14-19).

## V.    <u>Relevant Evidence</u>

The undersigned has reviewed all of the evidence before the Court. The information most pertinent to Claimant's challenges is summarized as follows:

### A. Claimant's Testimony

At his administrative hearing on October 16, 2015, Claimant stated that he became disabled on January 7, 2008 when he bent over to tie his shoe and could not stand up. (Tr. at 55). Claimant stated that from 2008 to 2012, he could not stand for more than an hour at a time, or bend over to grab anything heavy and carry it. (Tr. at 61). During that time period, he received cortisone shots. (*Id.*). Claimant testified that he was allergic to opioids, even in synthetic forms, as well as penicillin and its derivatives and non-steroidal anti-inflammatory drugs. (Tr. at 63-64). Claimant stated that he spent 80 percent of the day in his bed and got in and out of the bathtub four or five times per day and sometimes sat on his porch for an hour. (Tr. at 61-62). He sometimes used a scooter at home, did not drive because of numbness in his left leg, and brought a walker with him outside of the house. (Tr. at 69-70). For the past four years, Claimant would "use the bathroom on [himself]" when he felt a sharp back pain that felt like he was being electrocuted. (Tr. at 70). Claimant further reported that he sometimes fell when trying to stand up and had plantar fasciitis and shin splints in which the pain radiated in the arches of his feet up into his ankles and shins. (Tr. at 71-72).

### B. Treatment Records

On June 10, 2010, Claimant presented to the Veteran's Affairs Medical Center ("VAMC") emergency room, stating that he was having back pain with bladder incontinence when he walked. (Tr. at 628, 635). The issue reportedly began two days

earlier when he "was working on a car and rolled off a wall about 2 feet." (Tr. at 628). Claimant had normal range of motion, but a left back spasm. (Tr. at 630). The emergency room physician assessed Claimant with "back pain loss of bladder and bowel function." (*Id.*). A lumbosacral spine MRI showed a small disc protrusion at L4-5 with disc degeneration and desiccation, but no spinal stenosis or neural foraminal narrowing. (Tr. at 566).

Claimant saw a social worker at the VAMC for a mental health intake evaluation on October 26, 2010. Claimant reported chronic pain in his back, ankles, and knees, which he rated as 5 on a 10-point pain scale. (Tr. at 616). Claimant stated that he was currently working as a mechanic, and his activities and hobbies included "cars." (Tr. at 618). That same day, Claimant sought treatment for continuing pain "on the tops of both hips" that radiated down the back of his legs to his knees. (Tr. at 622). He was diagnosed with lumbago and given prescriptions for ibuprofen and Ultram. (*Id.*).

On November 5, 2010, Claimant returned to the VAMC and requested medication to help him sleep. (Tr. at 609). He reported that he had worsening back pain since the summer and was taking Ultram, ibuprofen, and using Icy Hot. (*Id.*). Claimant stated that he was a self-employed mechanic, but he had not worked recently. (*Id.*).

On December 21, 2010, Claimant saw VAMC anesthesiologist, Ghassan T. Moufarrege, M.D., for low back and bilateral leg pain. (Tr. at 575). Claimant reported having the pain since slipping on ice and falling on his back in 1999. (*Id.*). The pain was "off and on" until June 2010 when he was bending over to tie his shoe and the "pain came back and never went away." (*Id.*). Claimant stated that Ultram and a TENS unit did not provide him relief. (*Id.*). He took hot baths and applied heat to alleviate the

pain. (*Id.*). Claimant stated that riding in a car and sitting made the pain worse. (*Id.*). On examination, Claimant had normal gait, heel and toe walking, sensation, and motor strength. (Tr. at 577). However, he had tenderness on palpation and lumbar pain with flexion at 40 degrees and extension at 20 degrees. (*Id.*). He had no pain with lateral bending, and his straight-leg raising and Patrick's tests were negative. (*Id.*). Claimant was given a lumbar epidural steroid injection at L4-5. (Tr. at 578). Claimant developed severe back pain after his injection; thus, MRIs were taken the following day, which showed a normal thoracic spine and mild degenerative disc changes in his lumbar spine, with no focal disc herniation or lumbar stenosis. (Tr. at 588, 594, 597).

On December 31, 2010, Claimant returned to the VAMC and reported pain in the back of his neck and skull, which he stated began the day after his lumbar injection and was getting progressively worse. (Tr. at 590). He was applying ice and heat and taking Robaxin and Flexeril without relief. (*Id.*). Claimant stated that he could only tolerate one ibuprofen per day and was intolerant to opioid narcotics. (Tr. at 590, 592). On examination, Claimant's gait and muscle strength were normal, and he showed no neurological deficits. (Tr. at 591). Claimant was diagnosed with a posterior cervical/occipital headache that was possibly a spinal headache given the fact that it started after Claimant's injection and was slightly relieved by lying down. (Tr. at 592).

On August 19, 2011, when Claimant was seen for mental health treatment at the VAMC. He noted that he used to work for the VAMC, but now had his own business working as a mechanic. (Tr. at 672). Later that year, on December 8, 2011, Claimant returned to the VAMC and presented for a primary care walk-in visit. Claimant stated that approximately ten days earlier, he was buying a transmission for a car at AutoZone, when it started to fall. He tried to catch it and injured his back. Claimant

10

had a history of low back issues off and on, but now also had incontinence of urine in the form of dribbling when he stood up, testicular pain and swelling, and left hip pain. (Tr. at 665-67). He used heat, ice, and a TENS unit without relief. (*Id.*). Claimant again noted that he was a mechanic. (*Id.*). On examination, Claimant had a "marked decrease" in range of motion in his spine on all planes, spasms in the left paravertebral area, and an impaired gait. (Tr. at 666). He was diagnosed with an acute exacerbation of lumbar pain secondary to catching a transmission at AutoZone. (Tr. at 667). The plan was to obtain a MRI and start Claimant on prednisone and topical lidocaine. (*Id.*). It was noted that Claimant failed lumbar epidural steroid injections in the past. (*Id.*).

On December 12, 2011, Claimant presented to the VAMC for x-rays of his ankles and knees. Claimant had a small calcification on his right ankle, most likely representing a secondary ossification center, but no other significant bony abnormalities in either ankle and no significant or focal abnormality in either knee. (Tr. at 646, 648). Shortly thereafter, Claimant had a repeat lumbosacral spine MRI on December 19, 2011. The study showed disc degeneration and desiccation with multilevel disc bulges and some narrowing of the left neural foramen at L5-S1. (Tr. at 717).

Approximately two years later, on February 24, 2014, Claimant was examined by internist, Manimekalai V. Raman, M.D., and was assessed with hypertension, gastroesophageal reflux disease (GERD), and abdominal pain. (Tr. at 822). Claimant's extremities were noted to be "grossly within normal limits." (*Id.*). He was prescribed Toprol and Bentyl and scheduled to see a surgeon.  On April 23, 2014, Claimant underwent a lateral internal sphincterotomy, performed by Dr. Paul Bown, due to an anal fissure that was causing pain and bleeding. (Tr. at 788).

11

### C. Evaluations and Opinions

On October 11, 2011, Claimant underwent an Independent Living Assessment by Deborah S. Frost, a vocational rehabilitation counselor. Claimant reported that he could walk about five blocks and used a scooter inside of his home when his back was bothering him. (Tr. at 336). The secondhand scooter was a "gift from a friend." (*Id.*). Claimant did not do any grocery shopping due to difficulty walking and discomfort when riding in a car. (Tr. at 338). He infrequently took odd jobs in an effort to supplement his income and was currently working on his friend's truck, but stated that he was limited to working for short periods. (*Id.*). Claimant acknowledged that he could bathe and dress himself. (Tr. at 338-39).

On January 13, 2012, agency physician, Narendra Parikshak, M.D., assessed Claimant's physical RFC based upon a review of his records. Dr. Parikshak opined that Claimant could perform light level work with occasional postural activities and no concentrated exposure to extreme cold, vibration, or hazards. (Tr. at 702-05). Dr. Parikshak considered Claimant to be only partially credible and cited in support of her assessed limitations that Claimant's lumbar spine MRI showed degenerative disc disease while x-rays of his ankles and knees showed no significant abnormalities, and he had some limitations in lumbar spine range of motion on December 12, 2011. (Tr. at 706).

On January 24, 2012, Claimant underwent a VAMC compensation and pension examination. Thomas R. Poskitt, M.D., opined that Claimant's service-connected disabilities precluded "physical" employment due to a combination of factors resulting from an ankle injury and bilateral patellofemoral pain syndrome. (Tr. at 722). Dr. Poskitt stated that Claimant's left ankle would become painful and swollen when

working on his feet and the pain traveled up his leg. Also, Claimant's knees swelled and became painful with walking and would "give out" making it dangerous for him to carry heavy loads. (*Id.*). Dr. Poskitt stated that Claimant's service-connected disabilities had no impact on his ability to do "sedentary employment." (*Id.*).

Caroline Williams, M.D., reviewed Claimant's file and affirmed Dr. Parikshak's RFC on February 25, 2012. (Tr. at 729). Dr. Williams considered Dr. Poskitt's opinion in her review of the record and noted that it did not significantly differ from the other medical consultants' opinions. (*Id.*).

On April 17, 2013, Claimant had a disability evaluation performed by Dr. Apgar. (Tr. at 751-73). Claimant reported that he was in the United States Army from 2000 to 2003, worked at the VAMC from 2004 to 2005, worked at Clarks Auto from 2006 to 2007, and was unemployed since 2007. (Tr. at 752). His medications included Sertraline and Buspar. Claimant stated that he was allergic to Penicillin, Lortab, Percocet, and Ultram. (*Id.*). Claimant could get on and off the examination table, move about the room, and dress and undress with difficulty. (Tr. at 755). He exhibited good posture while seated and standing and was noted to be obese, with no mechanical limitations or dyspnea due to obesity. (*Id.*). The examination of Claimant's extremities was normal, including no tremors, atrophy, redness, swelling, structural abnormality, or instability. (Tr. at 758-59). However, his gait was not fully weight-bearing and was unsteady, deliberate, and antalgic. (Tr. at 759). Claimant reported that he used a power chair when his pain was severe. (*Id.*). Claimant's peripheral vascular examination was normal; his back had normal curvature with no spasms; and his neurological examination was also normal. (Tr. at 759-60). Dr. Apgar's impression was that Claimant had chronic pain syndrome; obesity; anxiety and depression, by history;

13

GERD; and hemorrhoids with rectal pain and bleeding. (Tr. at 761). Dr. Apgar concluded that, based on the objective findings, Claimant would have marked difficulty with sitting, standing, walking, traveling, lifting, carrying, pushing, pulling, bending, kneeling, stooping, and crawling. (Tr. at 762).

Dr. Apgar also completed a medical source statement of ability to do work-related activities form, noting that Claimant could continuously lift or carry up to 10 pounds and frequently lift or carry up to 20 pounds. (Tr. at 767-68). He could sit for three hours, stand for three hours, and walk for two hours total in an eight-hour workday, but could only do each activity for an hour at a time. (Tr. at 768-69). Dr. Apgar noted that Claimant did not require a cane to ambulate, but due to restricted range of motion in his hips and weakness in his right lower extremity, Claimant could only occasionally operate a foot control with his right foot and frequently operate a foot control with his left foot. Claimant could never perform postural activities, except that he could occasionally climb stairs and ramps and frequently balance. (Tr. at 769-71). In terms of environmental limitations, Dr. Apgar found that Claimant should never be exposed to moving machinery, extreme cold, or vibration; could occasionally operate a motor vehicle; and could tolerate other conditions continuously. (Tr. at 772). Finally, Dr. Apgar noted that Claimant could perform activities like shopping; travel without a companion for assistance; ambulate without assistance; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single handrail; prepare a simple meal and feed himself; and care for personal hygiene. (Tr. at 773). Dr. Apgar stated that Claimant did not profess to use a power chair for anything more than short distances. (*Id.*).

## VI.    <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.   <u>Discussion</u>

Claimant challenges the Commissioner's decision on three grounds: (1) the ALJ misstated and failed to discuss certain evidence from the consultative examination report prepared by Dr. Apgar; (2) the ALJ did not fully and properly evaluate the effects of his obesity; and (3) the ALJ did not fairly evaluate his pain and credibility. These arguments are considered below, in turn.

### A. Exertional and Postural Limitations

Claimant argues that the ALJ's decision is unsupported by substantial evidence, because the ALJ misstated and omitted certain portions of Dr. Apgar's consultative examination report and other evidence in the record concerning Claimant's exertional and postural abilities, which resulted in "creating conflicts rather than resolving them." (ECF No. 10 at 8-9). Specifically, Claimant contends that the ALJ misstated Claimant's ability to get on and off the examination table and move around the room during Dr. Apgar's examination. (*Id.* at 9). Claimant also states that the ALJ overlooked Dr. Apgar's observations that Claimant was not fully weight-bearing; had an unsteady gait; and could not heel, toe, or heel-to-toe walk, squat, or rise. (*Id.* at 10). Further, Claimant asserts that the ALJ's representation that Dr. Apgar found Claimant to be "obese without mechanical limitations" did not appear anywhere in Dr. Apgar's report. (*Id.* at 10). Claimant suggests, without explicitly stating, that the ALJ's misreading of Dr. Apgar's report resulted in an RFC finding that is not supported by substantial evidence.

The ALJ considered Dr. Apgar's consultative examination report along with other evidence in assessing Claimant's RFC. Social Security Ruling ("SSR") 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on

a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions that the ALJ should assess include the claimant's physical abilities, "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching);" mental abilities; and other abilities, "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions." 20 CFR §§ 404.1545(b-d), 416.945(b-d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636 (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

In this case, the ALJ found that Claimant could perform a very limited range of light work that involved sitting, standing, or walking in increments of only one hour at a time, as well as numerous other restrictions. (Tr. at 32). In making this finding, the ALJ considered Claimant's subjective complaints, reported use of ambulatory aids, obesity, treatment history, activities of daily living, objective findings, consultative examination, and the opinion evidence. (Tr. at 33-36). The ALJ noted that Claimant reinjured his back in 2011 while lifting a transmission and found that Claimant's ability to work as a mechanic was inconsistent with his allegations of disability. (Tr. at 34, 36). The ALJ also found that Claimant had received minimal treatment for degenerative disc disease, knee and ankle pain, and plantar fasciitis, and that his activities of daily living, such as caring for his own personal needs with some help, making simple meals, sweeping the floors, and shopping alone for one or two items, were inconsistent with his allegations of disability. (Tr. at 34-35). In making the RFC finding, the ALJ ultimately gave the most weight to the limitations assessed by the consultative

examiner, Dr. Apgar, on the basis that they were consistent with the overall objective evidence. (Tr. at 37). The ALJ gave little weight to the state agency physicians' assessment that concluded that Claimant had a greater ability to sit and stand, because the ALJ found that Dr. Apgar's assessment of Claimant's restrictions was more consistent with the evidence. (*Id.*).

Despite the fact that the ALJ adopted *all* of the exertional and postural limitations assessed by Dr. Apgar, Claimant argues that the ALJ erred by misstating or omitting certain evidence from the RFC discussion. First, as to the ALJ's misstatement that Claimant did not have difficulty getting on and off the examination table or moving about the room during his one-time consultative examination, the undersigned finds such statement to constitute harmless error, because it is inconceivable that the ALJ would have reached a different result absent these misstatements. *See, e.g., Flores v. Colvin*, No. 1:13CV513, 2016 WL 3102023, at *2 (M.D.N.C. June 2, 2016) (holding that the ALJ's misstatement that the claimant did not report any side effects from medication was harmless); *Wajler v. Colvin*, No. 1:13CV156, 2014 WL 4681759, at *5 (N.D.W. Va. Sept. 19, 2014) (discussing the application of harmless error in the context of reviewing the Commissioner's decision); *Barnes v. Colvin*, No. 5:12-CV-696-D, 2013 WL 6985182, at *13–14 (E.D.N.C. Nov. 13, 2013), *report and recommendation adopted,* 2014 WL 126059 (E.D.N.C. Jan. 13, 2014). As noted, the ALJ adopted the limitations assessed by Dr. Apgar. Therefore, the ALJ's error regarding Dr. Apgar's consultative examination findings very clearly did not affect the ALJ's ultimate RFC assessment. Further, the ALJ expressly considered the evidence bearing on Claimant's functional limitations and provided substantial support for the RFC finding. The ALJ considered Claimant's re-injury of his back in December 2011.  The ALJ noted that, at

that time, Claimant had a markedly decreased range of motion in his spine, back spasms, and an impaired gait. (Tr. at 35). The ALJ also discussed that Claimant's December 2011 lumbar spine MRI showed disc degeneration and bulges and narrowing of the left neural foramina at L5-S1. (*Id.*). Regarding Claimant's knee, ankle, and feet complaints, the ALJ noted Claimant's diagnoses of arthritis, left ankle sprain with ligamentous tear, patellofemoral pain syndrome in his knees, right knee lateral ligament tear, and plantar fasciitis, but the ALJ remarked upon the lack of significant x-ray findings and minimal treatment for such complaints. (*Id.*). As to Claimant's April 2013 consultative examination, the ALJ cited that Claimant reported using a power wheelchair at times and walked with a deliberate and antalgic gait, had positive straight-leg raising tests, and decreased range of motion in his lumbar spine and hips. (*Id.*).

The ALJ weighed the above evidence against the fact that Claimant had no abnormalities in his lower joints, no back spasms, and intact sensation. (*Id.*). Also, the ALJ considered that Claimant had not received any recent emergency or inpatient treatment and, although he elected to use a walker and scooter at times, there was no evidence that the ambulatory aids were prescribed to him. (Tr. at 37). Overall, in reviewing the record in its entirety, the ALJ adopted the limitations assessed by Dr. Apgar, which constituted the most restrictive RFC opinion in the file. Claimant fails to demonstrate how the ALJ's errors in recounting the consultative examination had any conceivable impact upon the ultimate decision.

Next, regarding the fact that the ALJ did not mention that Claimant was not fully weight bearing with an unsteady gait and could not heel, toe, or heel-to-toe walk; squat; or rise at his consultative examination, an ALJ is not required to comment upon

every piece of evidence in the record. *Hart v. Colvin*, No. 3:14-CV-00169-FDW, 2015 WL 470448, at *6 (W.D.N.C. Feb. 4, 2015) ("However, the ALJ does not need to comment on every piece of evidence in the record, and the[ ] failure to cite a specific piece of evidence is not an indication that the evidence was not considered.") (citation omitted); *Vest v. Colvin*, No. 2:15-CV-05886, 2016 WL 5334668, at *8 (S.D. W. Va. Sept. 22, 2016) (An "ALJ is not required to discuss every piece of evidence, but only evidence which, 'if believed, could lead to a finding of disability.'") (citations omitted). The ALJ expressly noted Claimant's deliberate and antalgic gait. (Tr. at 35). Upon considering all of the evidence of record regarding Claimant's physical impairments, the ALJ restricted Claimant's RFC to, *inter alia*, sitting for one hour at a time for a total of three hours in a workday, standing for one hour at a time for a total of three hours in a workday, walking for one hour at a time for a total of two hours in a workday, limited use of foot controls, occasionally climbing ramps and stairs, frequently balancing, and never climbing ladders, ropes, or scaffolds or stooping, kneeling, crouching, or crawling. (Tr. at 32). As shown above, the ALJ provided support for the RFC assessment grounded in the objective medical evidence and opinions. There is no indication that the portions of the consultative examination that the ALJ neglected to discuss rendered the decision unsupported by substantial evidence, as the relevant functional abilities were all considered and the ALJ adopted the limitations included in Dr. Apgar's RFC assessment that specifically considered all of the consultative examination findings.

Finally, as the Commissioner points out, the record belies Claimant's argument that the ALJ incorrectly stated Dr. Apgar's conclusion that Claimant was obese without mechanical limitations. Such a statement clearly appears in Dr. Apgar's report. (Tr. at

755). Consequently, the ALJ accurately reported that clinical observation.

Accordingly, for the above reasons, the undersigned **FINDS** that the ALJ did not err in her analysis of Claimant's exertional and postural abilities and her findings are supported by substantial evidence.

### B. Chronic Pain

Claimant next states that the ALJ incorrectly disregarded Dr. Apgar's diagnosis of chronic pain syndrome despite the fact that Claimant's progress note on December 8, 2011 provided that Claimant had chronic back pain. (ECF No. 10 at 10). Claimant also argues that the ALJ incorrectly stated that his back pain was adequately managed with pain medications until his re-injury in 2011, although the record was clear that Claimant could not tolerate pain medications. (*Id.* at 11).

Under the Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, a claimant's "statement about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other

22

symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating the credibility of a claimant's statements, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSR 96-7P, 1996 WL 374186, at *4-5. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). Thus, while the ALJ may not reject

a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations, the lack of objective medical evidence is one factor that may be considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

SSR 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations … for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.*

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court will not replace its own credibility assessment for that of the ALJ; rather, the Court must scrutinize the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the

24

Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ performed the requisite two-step analysis. The ALJ considered Claimant's allegations and evidence and found that Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (Tr. at 36). However, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (*Id.*). As noted, the ALJ found that Claimant's continued work as a mechanic, activities of daily living, and level of treatment were inconsistent with his allegations of disability. (*Id.*). In making this finding, the ALJ also considered the opinion evidence, including Dr. Apgar's consultative examination report. The ALJ gave great weight to Dr. Apgar's assessment of Claimant's physical limitations; however, the ALJ gave little weight to Dr. Apgar's diagnosis of chronic pain syndrome because Dr. Apgar evaluated Claimant for a physical consultative examination, not a psychological evaluation, and because Claimant's minimal psychological treatment did not support it being a severe impairment. (Tr. at 37).

Claimant argues that the little weight that the ALJ assigned to Dr. Apgar's diagnosis of chronic pain syndrome was erroneous because his progress note from December 8, 2011 listed that he had "chronic back pain." (ECF No. 10 at 10-11). Yet, as discussed in the Commissioner's brief, chronic pain syndrome encompasses more than

just chronic physical pain. (ECF No. 13 at 14-15). Rather, it is a complex, multifactorial syndrome, generally with a psychological component.[1] Claimant does not challenge the ALJ's analysis or findings with respect to his psychological impairments. Rather, he appears to argue that the ALJ improperly evaluated or minimized his chronic pain.

However, the ALJ considered Claimant's allegations that his functional abilities and daily activities were very limited and that he spent the majority of the time sitting to stay comfortable. (Tr. at 33). The ALJ recognized Claimant's assertion that he could not take certain pain medications because they caused bleeding; however, the ALJ noted that Claimant was prescribed pain medications and received steroid injections in 2010. (Tr. at 34). The ALJ found that Claimant received minimal treatment for his back complaints since 2011 and minimal treatment for his knee, ankle, and feet pain during the relevant period. (Tr. at 35). The ALJ further considered the ramps and handrails that the Department of Veteran's Affairs provided for Claimant's home and the opinion evidence. (*Id.*). Nevertheless, when weighing all of the evidence, the ALJ did not find Claimant's allegations of pain and symptoms to be fully credible.

In this case, the ALJ performed a thorough analysis of Claimant's alleged pain and symptoms and assessed the credibility of his statements. Claimant does not demonstrate how the ALJ's indication that he afforded little weight to the one-time diagnosis of chronic pain syndrome by Dr. Apgar in any way affected the decision. Furthermore, the ALJ's evaluation of the credibility of Claimant's pain complaints, including the ALJ's finding that his back pain was adequately controlled on medication prior to December 2011, is supported by the record. In October 2010, although

---

[1] *See, e.g.,* Manish K. Singh, M.D., *Chronic Pain Syndrome, Etiology,* MEDSCAPE, https://emedicine.medscape.com/article/310834-overview#a6 (last updated Feb. 22, 2018).

Claimant stated that he had chronic back pain that he rated 5 on a 10-point pain scale, he continued to work as a mechanic. (Tr. at 616, 618). He was given refills of the pain medications Ultram and ibuprofen. (Tr. at 622). Claimant reiterated in November 2010 that he was taking Ultram, ibuprofen, and using Icy Hot for chronic back pain. (Tr. at 609). In December 2010, Claimant stated that Ultram and his TENS unit did not alleviate his pain, but he took hot baths and applied heat for relief. (Tr. at 575). Claimant was given a lumbar steroid injection, but he developed what was believed to be a spinal headache and it was noted that Claimant failed lumbar steroid injections. (Tr. at 578, 667). As the ALJ referenced, Claimant continued to work as a mechanic during his alleged disability and, although Claimant reinjured his back in December 2011, he did not have any recent emergency treatment or hospitalization for any of his impairments. (Tr. at 34, 36, 37, 618, 665, 672). Therefore, there is more than a scintilla of evidence to support the ALJ's conclusion that Claimant's back pain was adequately controlled until December 2011 and, although it was exacerbated at that time, his subsequent treatment and findings were not indicative of a totally disabled individual; moreover, there is more than a scintilla of evidence to support the ALJ's finding that Claimant received minimal treatment during the relevant period for his knee, ankle, and feet pain. *Jones v. Berryhill*, No. 2:15-CV-13239, 2017 WL 658000, at *1 n.2 (S.D.W. Va. Feb. 17, 2017) ("For the purposes of reviewing an ALJ's decision in a social security case, substantial evidence is more than a scintilla of evidence but may be somewhat less than a preponderance.") (citations and markings omitted). Therefore, the undersigned **FINDS** that the ALJ's analysis of Claimant's pain and credibility accorded with the applicable law and is supported by substantial evidence.

### C. Obesity

Claimant next argues that the ALJ failed to properly consider his obesity in accordance with Social Security Ruling 02-1p ("SSR 02-1p"). (ECF No. 10 at 10). SSR 02-1p identifies four ways obesity may be considered in the sequential evaluation process. It may be considered in determining whether the individual has a medically determinable impairment; whether the individual's impairment is severe; whether the individual's impairment meets or equals the requirements of a listing; and whether the individual's impairments prevent the individual from doing the indvidual's past relevant work or other work existing in significant numbers in the national economy. 2002 WL 34686281, at *3. The Ruling provides that "[w]hen establishing the existence of obesity, [the SSA] will generally rely on the judgment of a physician who has examined the claimant and reported his or her appearance and build, as well as weight and height." *Id.* Therefore, "in the absence of evidence to the contrary in the case record, [the SSA] will accept a diagnosis of obesity given by a treating source or by a consultative examiner." *Id.*

In considering obesity at step two of the sequential evaluation, "[t]here is no specific level of weight or BMI that equates with a 'severe' or a 'not severe' impairment," and "[n]either do descriptive terms for levels of obesity (e.g., 'severe,' 'extreme,' or 'morbid' obesity) establish whether obesity is or is not a 'severe' impairment for disability program purposes." *Id.* at *4. Ultimately, the SSA conducts an individualized assessment of an individual's obesity in determining whether an individual's obesity impacts his or her functioning to the degree that a finding of "severe" is appropriate. *Id.*

When evaluating obesity under the Listing at step three of the sequential

evaluation, the SSA will not make assumptions "about the severity or functional effects of obesity combined with other impairments." *Id.* at *6. The SSA will not make such assumptions because "[o]besity in combination with impairment may or may not increase the severity or functional limitations of the other impairments." *Id.* Therefore, in each case, an individualized determination of a claimant's functional limitations as a result of obesity will be made based on the medical record. *Id.*

At steps four and five of the sequential evaluation, the SSA assesses the residual functional capacity of a claimant. The SSA recognizes that "[o]besity can cause limitation of function." *Id.* at *6. Specifically, as a result of obesity:

> An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.

*Id.* The SSA must take this into consideration when completing an individualized assessment of a claimant's residual functional capacity. Ultimately, the SSA "will explain how [it] reached [its] conclusions on whether obesity caused any physical or mental limitations" with respect to a claimant's residual functional capacity. *Id.* at *7.

In this case, the ALJ found Claimant's obesity to be a severe impairment at step two of the sequential evaluation. (Tr. at 30). At step three, the ALJ specifically cited SSR 02-1p and stated that she considered Claimant's obesity and the combined effects of his impairments. (Tr. at 31). The ALJ concluded that considering all of the evidence, including the interactive and cumulative effects of Claimant's impairments, Claimant did not have a combination of impairments that met or medically equaled a listed impairment. (*Id.*). Then, in forming Claimant's RFC, the ALJ gave great weight to Dr.

Apgar's findings and included all of Dr. Apgar's assessed limitations, which specifically considered Claimant's obesity. (Tr. at 37). Claimant has not pointed to any specific evidence that his obesity imposes any additional functional limitations or pain that was not considered and accounted for in the ALJ's decision. *See Reed v. Berryhill*, No. 1:17-CV-02299, 2018 WL 2423021, at \*21 (S.D.W. Va. Mar. 22, 2018), *report and recommendation adopted,* 2018 WL 2419105 (S.D.W. Va. May 29, 2018)*; Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3rd Cir. 2005) (declining to remand where ALJ did not consider claimant's obesity because claimant failed to specify how her obesity specifically affected her ability to work other than generally stating that it made it more difficult for her to stand, walk, and use her hands and fingers); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (declining to remand where ALJ did not explicitly address claimant's obesity, claimant only speculated that his obesity affected his ability to work, and the ALJ adopted the limitations suggested by reviewing physicians who were aware of claimant's obesity); *Copning v. Colvin*, No. 3:14-cv-00529, Dkt. No. 14 at 56-57 (S.D.W. Va. Jan. 26, 2015) (rejecting argument that ALJ failed to properly consider claimant's obesity where claimant failed to cite evidence supporting allegation that obesity caused additional functional limitations), *report and recommendation adopted by* Dkt. No. 25 (S.D.W. Va. Mar. 30, 2015); *Michael*, 2010 WL 697000, at \*15 (adopting report and recommendation wherein magistrate judge rejected claimant's argument that remand was required to consider his obesity when claimant failed to assert how his obesity contributed to his inability to work). Consequently, the undersigned **FINDS** that the ALJ fulfilled her duty to evaluate Claimant's obesity in accordance with the applicable rules and regulations.

## VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 10); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 13); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  July 6, 2018

Cheryl A. Eifert
United States Magistrate Judge